2017 BNH 011     Note:   This is an unreported opinion. Refer to LBR 1050-1 regarding citation.
_____

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:                                                                                       Bk. No. 09-13399-JMD
                                                                                             Chapter 13

Michael S. Franklin,
            Debtor

*Darlene M. Daniele, Esq.*                          *Michael McCormack, Esq.*
*Salem Legal Services, LLC*                         *United States Department of Justice*
*Salem, NH*                                         *Concord, NH*
*Attorney for the Debtor*                           *Attorney for the United States of America on*
                                                    *behalf of the United States Department of*
                                                    *Agriculture, Rural Development*

## MEMORANDUM OPINION

### I. INTRODUCTION

The matter before the Court is the "Debtor's Motion for Contempt and Sanctions for Violation of Order Confirming Chapter 13 Plan and 11 U.S.C. § 362, § 524(i)"[1] (the "Motion for Contempt") filed by Michael S. Franklin (the "Debtor") and the objection thereto[2] filed by the United States Department of Agriculture, Rural Development (the "USDA"). Through the Motion for Contempt, the Debtor seeks redress for mistakes the USDA made in accounting for his mortgage payments during his Chapter 13 case. The USDA asserts that the Debtor has not suffered any actual damages arising from its misapplication of his payments. For the reasons set forth below, the Court will grant the Motion for Contempt.

---

[1] Doc. No. 70.

[2] Doc. No. 75.

**II. JURISDICTION**

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a), 1334, and U.S. District Court for the District of New Hampshire Local Rule 77.4(a). This is a core proceeding under 28 U.S.C. § 157(b)(2).

**III. FACTS**

A. <u>Procedural History</u>

The Debtor filed a Chapter 13 petition on August 31, 2009. On Schedule A – Real Property ("Schedule A"), he listed a fee simple interest in property located at 3 Blue Boar Lane in Canterbury, New Hampshire (the "Property") with a value of $129,000. According to Schedule D – Creditors Holding Secured Claims ("Schedule D"), the Property is encumbered by a mortgage securing loans by the USDA in the amounts of $80,990 and $4,967. On October 23, 2009, the USDA filed a proof of claim listing a single secured claim in the amount of $87,217.47, with a prepetition arrearage in the amount of $370.68 (the "Claim"). The Claim indicates that the prepetition arrearage arose from a single missed payment that was due on August 19, 2009, shortly before the filing of the bankruptcy petition.

On February 3, 2010, the Court entered an order confirming the Debtor's Chapter 13 plan as orally modified to cure the prepetition arrearage owed to the USDA and maintain regular postpetition payments outside the plan (the "Confirmation Order"). On October 30, 2014, the Chapter 13 trustee (the "Trustee") filed a Notice of Final Cure and Completion of Plan Payments, indicating that the USDA's prepetition claim had been paid in full by the Trustee and that the Debtor had completed his payment obligations under the plan. The USDA did not file a response

alleging the existence of a postpetition payment default. See Fed. R. Bankr. P. 3002.1(g). Despite the completion of the plan, the Debtor did not receive a discharge until August 20, 2015, in light of his failure to file a financial management course certificate or provide the Trustee with an Affidavit of Compliance with Discharge Requirements.

On May 11, 2015, the Debtor filed the Motion for Contempt, asserting that the USDA had regularly misapplied his mortgage payments between April 2010, and April 2014, including those the Trustee paid. The Debtor further alleged that as a result, the USDA reported his mortgage account as delinquent to credit reporting agencies for 40 out of 48 months during that period. He argued that these deficiencies rendered the USDA in contempt of the Confirmation Order, the automatic stay, and, curiously, the discharge injunction. The Debtor requested that the Court award actual damages, attorney's fees, and punitive sanctions.

On May 29, 2015, the USDA filed an objection to the Motion for Contempt, conceding that payments had been misapplied, but denying that the accounting remained inaccurate. The USDA also asserted several affirmative defenses to the Motion for Contempt. They include: (1) incorrect credit reporting is not specifically precluded by 11 U.S.C. § 362; (2) the USDA could not have violated the discharge injunction because the Debtor had not yet received a discharge; (3) sovereign immunity precludes the award of punitive damages against the United States; and (4) the Debtor has not incurred any actual damages.

The Court held an initial hearing on the Motion for Contempt on June 9, 2015, at the conclusion of which the Court entered a pre-trial scheduling order. After numerous extensions and continuances granted at the request of the parties, the Court conducted an evidentiary hearing on April 20, 2017. At the commencement of the hearing, the Court ruled that any alleged violation of the discharge injunction would be outside the scope of the proceedings because a discharge had

not yet entered at the time the Motion for Contempt was filed. The Debtor also clarified that he was not pursuing a claim for misapplication of payments under the loan documents. Eleven exhibits were admitted into evidence, and only the Debtor testified. At the close of evidence, the Court ordered the parties to file written closing arguments and took the matter under advisement. The Debtor filed his closing argument on May 4, 2017, and the USDA did the same on May 15, 2017.

B. The Trial Record

1. The Misapplication of Mortgage Payments

It is undisputed that the USDA misapplied mortgage payments during the Debtor's Chapter 13 case. The full extent of the USDA's errors, which is relevant to the Debtor's claim for damages, remains in dispute. However, due to deficiencies in the record, the Court is not able to identify all such errors or confirm the adjustments made by USDA. Although the "corrected" loan histories that the USDA transmitted to the Debtor's counsel on August 27, 2014 (the "Amended Loan Histories") were admitted into evidence, no expert witness was called to explain their preparation or contents. Upon review, the Court finds the Amended Loan Histories confusing and patently inconsistent.[3] Moreover, because the Debtor did not provide all his monthly mortgage statements, which are the only documents showing the amount due each month,[4] or all his bank statements

---

[3] For example, one entry reflects that on September 1, 2009, the USDA received a partial payment of $300 from the Debtor, which was placed in a separate "unapplied" balance account (the "Unapplied Funds Account"). Five lines down, there is a non-chronological entry indicating that on the same date, $347.68 was drawn from the Unapplied Funds Account even though that account did not have sufficient funds to cover that payment until September 16, 2009. See Ex. 5 at 16. The Court presumes this is a result of retroactive corrections made by the USDA that are not differentiated from other contemporaneous notations.

[4] The Court notes that even though the USDA separately accounts for each of the Debtor's loans, the Debtor receives a single monthly statement that apparently combines both loans into a single amount due. See Ex. 6.

4

showing post-petition payments made to the USDA, the Court cannot determine when many payments were made and in what amount.[5]

Notwithstanding these deficiencies, the record does permit the Court to discern a range of time during which it is more likely than not that the USDA had consistently misapplied the Debtor's payments. The problems appear to have started on September 1, 2009, the day following the filing of his petition. Generally, the Debtor's mortgage payments are due on the 19th of each month, but varied in amount. Prepetition, the Debtor typically made his mortgage payments up to two weeks after the due date, but neither the Amended Loan History nor the Debtor's bank statements reflect any payments made in the month of August, 2009.[6] Therefore, as the Claim indicates, the record supports a conclusion that the Debtor was one payment behind on the petition date.

On September 1, 2009, the Debtor made a partial payment of $300.00 to the USDA, which was placed in an Unapplied Funds Account.[7] No explanation was offered for why funds were placed in this account and not immediately applied.[8] Notably, the Debtor's mortgage statement dated October 5, 2009, removed the "unapplied balance" column that previously appeared on his statements from February through May 2009,[9] and replaced it with a "total delinquent amount"

---

[5] See Ex. 6-7.

[6] Ex. 5 at 16.

[7] *Id.* Given the Debtor's payment record, it is possible that he intended this payment to be applied to the amount due for August 19, 2009. That might also partially explain why he testified that he believed the Claim was inaccurate, although he chose not to object to it.

[8] Although the Claim was admitted as exhibit 1, the Debtor did not attach the note and mortgage that accompanied the proof of claim. Even if he had, however, the USDA made no attempt to point to a provision of the note that authorized funds to be placed in an Unapplied Funds Account.

[9] See Ex. 6 at 1-4. The record does not contain the Debtor's monthly mortgage statements for June, July, August, or September, 2009.

5

column reflecting that the Debtor was, at that time, two full payments in arrears.[10]  As such, nothing on the face of the monthly mortgage statements from this point forward disclosed that the USDA credited payments and held balances in the Unapplied Funds Account.  Nevertheless, from September 1, 2009, until at least January 17, 2014, funds received from the Debtor were regularly placed in the Unapplied Funds Account before eventually being credited towards outstanding payments.[11]  As a result, the Unapplied Funds Account often held funds in excess of a single mortgage payment and sometimes with the balance rising to several thousand dollars despite USDA insisting that the Debtor was delinquent.[12]  No explanation for the application of funds in this manner was provided.

At trial, the Debtor testified that he first contacted the USDA regarding the application of his payments on October 9, 2009, upon receipt of the October 5, 2009 mortgage statement reflecting a two payment delinquency.  Although he had an attorney at the commencement of his bankruptcy case, he communicated with the USDA directly.[13]  The Debtor credibly testified that he was in "constant contact" with the USDA because every month his statement did not reflect payments that had already cleared his bank account.  Despite persistent efforts over many years, he was unable to resolve the issue on his own and was forced to retain new counsel in July, 2014 even though his bankruptcy case was coming to an end.  With the assistance of counsel, the Debtor was ultimately able to obtain a concession from the USDA that payments had been misapplied, prompting the USDA to produce the Amended Loan Histories in August, 2014.  Notwithstanding

---

[10] Ex. 6 at 5.  The Court notes that even though the USDA separately accounts for each of the Debtor's loans, the Debtor receives a single monthly statement reflecting a single total and single payment amount.

[11] Id. at 16-20.

[12] Id.

[13] The Debtor's original attorney withdrew in November, 2011, citing a breakdown of the attorney-client relationship.

the purported corrections contained therein, the Debtor testified that he believes the USDA continues to misapply his payments.[14]

While the accuracy of the Amended Loan History is doubtful, it contains several indications supporting the assertion that the USDA has yet to properly account for all the Debtor's payments. According to the Trustee's disbursement records, the prepetition arrearage arising from the failure to make the August, 2009 payment was paid in installments of $333.22 on February 17, 2010, and $37.78 on March 30, 2010.[15] The Amended Loan Histories do not reflect the receipt of the first payment of $333.22, although the check cleared. The second payment of $37.78 was placed in the Unapplied Funds Account rather than applied to the prepetition arrearage.[16] The Amended Loan History suggests that funds from the Unapplied Funds Account were applied to the August 19, 2009 payment on September 1, 2009, a date five and one-half months before payment by the Trustee, which, if true, would mean the USDA improperly applied postpetition payments to prepetition arrears.[17] The Court notes, however, that there was an insufficient balance in the Unapplied Funds Account to cover that payment before September 16, 2009, so there is no way to know the source of those funds or the date they were actually received by USDA. Curiously, the Amended Loan History does not appear to apply any funds to the September 19, 2009 payment.[18]

---

[14] The Debtor testified that the USDA started "hammering him" and sending him letters after August, 2014, though none of these letters are in the record and the Court has no information with respect to their contents.

[15] Ex. 4 at 2.

[16] Ex. 5 at 17.

[17] *Id.* at 16.

[18] The end of each of the Amended Loan Histories contain a series of entries identified as "Funds Reversed Due to Corrections," which are followed by a series of entries labeled "Payment Applied." It appears the USDA attempted to correct its accounting by transferring all funds previously applied to payments into the Unapplied Funds Account, and then re-applying those funds to payments beginning with the November 19, 2009. *Id.* at 20-24. It is unclear

2. The Credit Reports

It is undisputed that the USDA has regularly reported the status of the Debtor's loans to national credit reporting agencies. As one would expect, the confusion described above impacted the reports made by the USDA. Several of the Debtor's credit reports from TransUnion and Experian were admitted into evidence.[19]

The first TransUnion report was last updated on November 28, 2014 (the "First TransUnion Report").[20] TransUnion credit reports utilize the following key to describe payment information:

| N/R | X | OK | 30 | 60 | 90 | 120 | COL | VS | RPO | C/O | FC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Not Reported | Unknown | Current | 30 days late | 60 days late | 90 days late | 120 days late | Collection | Voluntary Surrender | Repossession | Charge Off | Foreclosure |

From February, 2009, to January, 2014, the First TransUnion Report reflects the Debtor was reported current 16 times with respect to the first loan, and 19 times with respect to the second.[21] The remaining notations for the 60 month period are all "unknown." The second TransUnion report dated July 9, 2015 (the "Second TransUnion Report"), which was updated April 30, 2014, does not provide any details with respect to the first loan, but reduces the number of "unknown" notations with respect to the second from 40 to 19 for the same period.[22]

In contrast, the Debtor's Experian credit reports indicate that he was delinquent on numerous occasions. An excerpt of an Experian credit report dated April 17, 2014, states that that the "account was delinquent 60 days past due four or more times," but without specifically

---

why September and October of 2009 are omitted, particularly as there is no indication any funds have ever been applied to the September, 2009 payment.

[19] Ex. 8.

[20] *Id.* at 2-3. In his written closing argument, the Debtor states that First TransUnion Report is dated April 2, 2014, but the Court cannot discern that date on the document.

[21] *Id.*

[22] *Id.* at 9-10.

8

identifying how many times or when.[23]  The Debtor's Experian credit report dated April 9, 2015 (the "Experian Credit Report") reflects the following delinquencies with respect to the first loan between February, 2009, and May, 2014:[24]

| Month | Days Late |
|---|---|
| August, 2009 | 30 |
| September, 2009 | 60 |
| October, 2009 | 90 |
| November, 2009 | 120 |
| December, 2009 | 150 |
| | |
| June, 2010 | 30 |
| July, 2010 | 30 |
| August, 2010 | 30 |
| September, 2010 | 30 |
| October, 2010 | 30 |
| November, 2010 | 30 |
| December, 2010 | 30 |
| January, 2011 | 30 |
| February, 2011 | 30 |
| | |
| April, 2011 | 30 |
| May, 2011 | 30 |
| June, 2011 | 30 |
| July, 2011 | 30 |
| | |
| October, 2011 | 30 |

The Experian Credit Report did not begin reporting the second loan until May, 2012, but lists 30 day delinquencies in May, June, July, and October, 2012.[25]

As it stands, the record does not permit the Court to determine whether the Debtor made every payment on time.  Given that the Amended Loan Histories do not reflect the Trustee's first payment and otherwise appear to contain non-contemporaneous entries which are not identified as such, the Amended Loan Histories are not sufficiently reliable for this purpose.  While the Debtor's

---

[23] *Id.* at 4.

[24] *Id.* at 7.

[25] *Id.* at 8.

bank records evidence payments to the USDA between September, 2009, and February, 2014, there are nine months for which there is no evidence the Debtor made a monthly payment. Further complicating matters is the fact that few mortgage statements are in evidence and, s a result, the Court cannot ascertain whether the payments the Debtor made were greater than or equal to the amount due in that particular month.[26] Finally, the Court notes that all mortgage payments evidenced by the Debtor's bank statements were made between the 1st and the 12th of each month, while the mortgage payments were due on the 19th. In light of the gaps in the record, it is unclear whether these payments were early or late.[27]

The only delinquencies in the Experian Credit Report the Court can verify are those reflected between August and December of 2009. The Debtor's bank statements show no payments made in August, 2009 and each of the payments made between September, 2009, and January, 2010, were less than the full amount due.[28] Notably, while short payments in these months would explain the reported delinquencies, it is unknown why the USDA then reported the Debtor as current in January, 2010.

### 3. Testimony Regarding Damages

The Debtor credibly testified that he spent a substantial amount of time between the fall of 2009 and the summer of 2014 trying to resolve his payment issues with the USDA by telephone, fax, and email. At trial, however, he was unable to provide any estimate of that time, or quantify the cost of any expenses he incurred as a result. The Debtor is disabled and does not work, but

---

[26] The records do reflect, however, that on at least five occasions the Debtor rounded his payment up to the nearest ten, resulting in an overpayment of between $4.00 and $6.00 in those months.

[27] At trial, the Debtor made some references to a grace period, suggesting that he believed his payments were generally sent after the due date.

[28] Compare Ex. 6 at 5-7 with Ex. 7 at 1-5.

testified that he used to perform contract work in child support enforcement and charged a minimum of $45.00 per hour.

The only claim for actual damages the Debtor was able to quantify arose from a lost financing opportunity in the spring of 2015. He testified that the USDA's inaccurate credit reporting caused his truck loan to be approved at a higher interest rate than was initially offered, resulting in an increased interest expense of approximately $1,300.00 over the life of the loan. Nevertheless, on cross-examination, the Debtor conceded that at the time he applied for the loan, his Chapter 13 case remained pending, and that he had previously filed at least one prior Chapter 7 case.[29]

## IV. POSITIONS OF THE PARTIES

### A. The Debtor

The Debtor argues that it is obvious from the Amended Loan Histories that the USDA has misapplied the Debtor's mortgage payments, and has yet to account accurately for all payments. In support, he cites a number of deficiencies, including: the apparent application of postpetition payments to the prepetition arrearage; the failure to apply the Trustee's payments to the prepetition arrearage; and the absence of any record of a September, 2009 payment. The Debtor further contends that the USDA's revisions, which amount to reversing and reapplying funds starting with the November, 2009 payment, conceal important details and render it impossible to determine whether payments were applied correctly.

---

[29] Bk. No. 03-14090-MWV.

As a result of these errors, the Debtor asserts that the USDA sent him inaccurate mortgage statements until November, 2014.[30] Additionally, he argues that the USDA inaccurately reported his loan to national credit reporting agencies as delinquent for 40 out of 48 months during his Chapter 13 case. Moreover, the Debtor notes that the Second TransUnion Credit Report and the Experian Credit Report, which both postdate the USDA's corrections, contradict each other and are inconsistent with the Amended Loan Histories.

The Debtor contends these acts violate the terms of the Confirmation Order and, to the extent that the USDA tried to collect funds that were not actually due, the automatic stay.[31] He asserts that his actual damages consist of: (1) approximately $1,300.00 on account of the loss of a lower rate for his truck financing; and (2) time for "countless" hours spent contacting the USDA. The Debtor asserts that he is also entitled to an award of reasonable attorney's fees under 11 U.S.C. § 362(k), 11 U.S.C. § 105(a), and/or the fee shifting provisions of N.H. RSA 361-C:1. Curiously, while the Debtor acknowledges that the Court cannot award emotional distress damages or punitive damages against the USDA, see 11 U.S.C. § 106(a)(3); U.S. v. Rivera Torres (In re Rivera Torres), 432 F.3d 20, 24 (1st Cir. 2005), he requests the Court forgive the balances of both loans as damages for the USDA's assorted violations. Finally, to the extent that the Debtor argues that the Amended Loan Histories remain inaccurate, he requests the Court order the USDA to provide a full accounting of both loans within 60 days.

---

[30] In his written closing, the Debtor complains that the USDA stopped sending him monthly mortgage statements in November, 2014, and only resumed after entry of the discharge on August 20, 2015. At trial, the Debtor's testimony on this point was vague at best. While the Court notes the argument for the sake of having a complete record, it does not impact the result in this case.

[31] Despite the colloquy at the commencement of trial in which the Court stated that it would not entertain the Debtor's claim for violation of the discharge injunction because the discharge had not entered at the time the Motion for Contempt was filed, the Debtor continues to press this claim post-trial.

B. The USDA

The USDA argues that the Debtor has not sustained his burden to show that he is entitled to recover any damages. First, the USDA asserts that it did not violate the automatic stay because there is no evidence showing that it took any affirmative steps to collect a debt, notwithstanding the errors in its accounting. In so arguing, the USDA urges the Court to conclude that the act of credit reporting, either correct or incorrect, is not a *per se* violation of the automatic stay.

In any event, the USDA contends that the Debtor has not suffered any actual damages on account of its actions. The USDA asserts that the Debtor did not offer any "meaningful" testimony regarding any damages he incurred at trial. With respect to the Debtor's allegation that he was forced to pay a higher interest rate on his vehicle loan, the USDA argues that the Debtor has not established that the dealership based this decision solely on the USDA's credit reporting, and not based on the Debtor's otherwise poor credit. Additionally, the USDA disputes that the Debtor is entitled to attorney's fees because he retained counsel in July, 2014, after the USDA corrected his loan histories in May, 2014.

**V. DISCUSSION**

To prevail on the Motion for Contempt, the Debtor must establish by a preponderance of the evidence that: (1) the USDA's conduct violated some statutory provision or court order; and (2) that he suffered recoverable damages on account of the USDA's violative conduct. See Vázquez Laboy v. Doral Mortgage Corp. (In re Vázquez Laboy), 647 F.3d 367, 376 (1st Cir. 2011). From the outset, the Court notes that the Debtor is limited to his actual damages, including costs and attorney's fees, because sovereign immunity precludes awards of emotional distress damages or punitive sanctions against the government. See United States v. Rivera Torres (In re Rivera

13

Torres), 432 F.3d 20, 34 (1st Cir. 2005) (concluding that "Congress has not 'definitely and unequivocally' waived sovereign immunity under § 106 of the Bankruptcy Code for emotional damages."); 11 U.S.C. § 106(a)(3) ("The court may issue against a governmental unit an order, process, or judgment . . . awarding a money recovery, but not including an award of punitive damages."). Here, the Debtor argues that the USDA violated the automatic stay and the Confirmation Order.

    A. Applicable Law

        1. The Automatic Stay

Upon the filing of a bankruptcy petition, 11 U.S.C. § 362(a) automatically stays a wide array of collection and enforcement proceedings against a debtor and his or her property. See 11 U.S.C. § 362(a). Specifically, that section imposes a stay against:

> (4) any act to create, perfect, or enforce any lien against property of the estate;
>
> (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title; [and]
>
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(6). Once a court determines that the automatic stay has been violated, 11 U.S.C. § 362(k)(1) provides that "an individual injured by any willful violation of a stay provided by this section *shall recover* actual damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1) (emphasis added). The words "shall recover" indicate that such awards are mandatory upon a finding of a willful violation of the stay. Duby v. United States of Am. (In re Duby), 451 B.R. 664, 670 (B.A.P. 1st Cir. 2011), aff'd, No. 11-9006, 2012 WL 12552111 (1st Cir. Apr. 17, 2012). "A willful violation does not

14

require a specific intent" and is established "if there is knowledge of the stay and the defendant intended the actions which constituted the violation." Fleet Mortg. Grp., Inc. v. Kaneb, 196 F.3d 265, 269 (1st Cir. 1999)

A creditor's misapplication of postpetition mortgage payments can result in a stay violation. Indeed, the Court has previously held that "[a]pplication of postpetition payments to prepetition obligations of a chapter 13 debtor is simply collection of a prepetition debt outside of a plan of reorganization prohibited by § 362(a)(6) of the Bankruptcy Code." Gaff v. Town of Pembroke (In re Doolan), 447 B.R. 51, 65 (Bankr. D.N.H. 2011). Additionally, the mortgagee violates the stay if the misapplication of payments results in improper fees and charges to the debtor's account. McCormack v. Fed. Home Loan Mortg. Corp. (In re McCormack), 203 B.R. 521, 525–26 (Bankr. D.N.H. 1996). Internal bookkeeping errors, however, do not violate the stay unless the creditor engages in some overt collection activity. See Mann v. Chase Manhattan Mortg. Corp., 316 F.3d 1, 3 (1st Cir. 2003). Notably, a majority of courts hold that the postpetition reporting of overdue or delinquent payments to credit reporting agencies, without intent to harass or coerce payment, is not a *per se* violation of the automatic stay. See, e.g., Keller v. New Penn Fin., LLC (In re Keller), 568 B.R. 118, 122 (B.A.P. 9th Cir. 2017); In re Porcoro, 565 B.R. 314, 326 (Bankr. D.N.J. 2017); Hickson v. Home Fed. of Atlanta, 805 F.Supp. 1567, 1573 (N.D. Ga. 1992), aff'd, 14 F.3d 59 (11th Cir. 1994); but see In re Sommersdorf, 139 B.R. 700, 700 (Bankr. S.D. Ohio 1991) (negative credit reporting postpetition is a per se violation of the stay).

### 2. The Confirmation Order

Section 1327(a) of the Bankruptcy Code provides that the "provisions of a confirmed plan bind the debtor and each creditor . . . ." 11 U.S.C. § 1327(a). Pursuant to 11 U.S.C. § 1322(b)(5), a plan may "provide for the curing of any default within a reasonable time and maintenance of

payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." 11 U.S.C. § 1322(b)(5). The purpose of this so called "cure and maintain" provision is to allow a debtor to pay the prepetition arrears on a mortgage through the confirmed plan while continuing to make postpetition payments at the contract rate. In re Doolan, 447 B.R. at 51 (citing In re Rathe, 114 B.R. 253, 257 (Bankr. D. Idaho 1990)). To effectuate this provision, a mortgagee is required to apply regular payments made during the pendency of the Chapter 13 case to the current payments due and owing, and the arrearage payments from the Chapter 13 trustee to the prepetition arrears. Id. Failure to properly account for payments in this manner renders the mortgagee in contempt of the confirmation order. Id. The Court may remedy such contempt under 11 U.S.C. § 105(a). See Ameriquest Mortgage Co. v. Nosek (In re Nosek), 544 F.3d 34, 43–44 (1st Cir. 2008). Contempt under 11 U.S.C. § 105(a) must be proven by "clear and convincing" evidence. Pratt v. Gen. Motors Acceptance Corp. (In re Pratt), 462 F.3d 14, 21 (1st Cir. 2006).

B. Analysis

In the present case, it is undisputed that the USDA misapplied the Debtor's mortgage payments. From September 1, 2009, until at least January 17, 2014, the USDA repeatedly placed funds received from the Debtor into the Unapplied Funds Account, often accumulating funds in excess of a mortgage payment, while simultaneously asserting that he was delinquent. Although the USDA insists that the loan histories have been corrected, the loan records remain incomplete and uncertain due to both known and unknown errors and omissions. Examples include: (1) the absence of the Trustee's first payment in the Amended Loan Histories; (2) the apparent application of a postpetition payment to the prepetition arrearage; and (3) the absence of any funds having

been applied to the September, 2009 payment.  Accordingly, the Court finds that the USDA began misapplying the Debtor's payments in September 2009, and has yet to account properly for all payments received thereafter.  Because the loan history records are cumulative, with each entry building on the last entry, the Court concludes that USDA's errors at the beginning of the bankruptcy, and its failure to correct those errors, infected their record keeping for the duration of the case.  Therefore, it is clear that the USDA violated both the automatic stay and the confirmation order.

That said, the Court is unable to determine exactly how many violations occurred for several reasons.  First, the Amended Loan Histories are unreliable due to the apparent existence of unidentified retroactive corrections.  Second, the record reflects that the Debtor failed to make full payments between September, 2009, and January, 2010, meaning that there was a delinquency, but it is unclear when he became current.  Third, as the Court has repeatedly noted, the gaps in the record do not permit a finding that all payments were, or were not, made in full.  Fourth, the Court is unable to determine whether the payments evidenced by the record were early or late.  For this reason, the Court cannot find that the USDA's credit reporting was inaccurate.[32]  Finally, the record is devoid of any suggestion that the USDA ever engaged in any overt collection activity other than sending monthly mortgage statements.

Notwithstanding these deficiencies, the Court finds that the USDA's misapplication of payments and the accuracy of its loan history records was a persistent issue over the life of the plan.  The Debtor testified as much, and the omissions and errors in the Amended Loan History, particularly the balance of the Unapplied Funds Account, support this conclusion.

---

[32] The Court notes that the vast majority of the notations the Debtor complains about are not delinquencies, but "unknown," meaning that the USDA did not have accurate information regarding the status of the loan.

17

Ultimately, the number of violations is only relevant to the determination of the Debtor's damages. In this sense, the Court's uncertainty is tempered by the Debtor's inability to quantify his actual damages. The Debtor's unrebutted testimony was that he spent countless hours over the years contacting the USDA in an effort to resolve the accounting of his mortgage. The Court finds this testimony credible, but also as indefinite as the Debtor's showing regarding the violations themselves. The Court must also consider that some communications may have been prompted by the Debtor's own failings, such as partial or late payments. Nevertheless, given the Court's conclusion that the USDA's errors were persistent throughout the case, an award to compensate the Debtor for at least a portion of his time is warranted.

The record indicates that the USDA began misapplying the Debtor's payments in September, 2009. From then until July, 2014, when he retained counsel, the Debtor dealt with the USDA directly. Over those 58 months, the Court finds that the Debtor spent at least two hours per month reviewing monthly mortgage statements and communicating with the USDA. At trial, the Debtor testified that prior to his disability, he charged a minimum rate of $45.00 per hour doing contract work. Applying this rate to two hours per month for 58 months yields actual damages in the amount of $5,220.00 . The Court will also award the Debtor an additional $100.00 for his out of pocket expenses. Although the Debtor testified that he believed that he received a higher interest rate on his vehicle loan because of the USDA's credit reporting, the Court finds that he has not sustained his burden to show he suffered an actual injury as a result of inappropriate conduct. Even assuming, *arguendo*, that the USDA's credit reporting was the sole factor influencing the interest rate he received, the Debtor did not establish a record showing that the notations were inaccurate.[33] In sum, the Court will award the Debtor $5,320.00 for his actual damages.

---

[33] The Court also notes that the Debtor's credit reports reflected that he was a debtor in a pending bankruptcy case.

In light of the USDA's violations of the automatic stay and confirmation order, the Debtor is also entitled to his reasonable attorney's fees. Therefore, the Court will order the Debtor's counsel to file an affidavit itemizing the fees incurred in this matter. Moreover, because the Court finds the Amended Loan Histories inaccurate, the Court and will order the USDA to provide to the Debtor a full accounting of both loans.

## VI. CONCLUSION

For the reasons articulated above, the Court will grant the Motion for Contempt. The Court shall award the Debtor actual damages in the amount of $5,320.00. The Debtor's counsel shall file an affidavit itemizing the fees incurred in this matter by September 13, 2017. The USDA shall provide the Debtor a full accounting of both loans by September 29, 2017. The accounting shall show the amount and date of receipt for all payments made by the Debtor and the Trustee, as well as the application of those payments. The USDA shall also provide the Debtor with a report of what errors are contained in his credit history because of erroneous reports by USDA and what steps USDA proposes to take, if any, to correct such errors.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. The Court will issue a separate order consistent with this opinion.

ENTERED at Manchester, New Hampshire.


Dated: August 24, 2017             /s/ J. Michael Deasy
                                   J. Michael Deasy
                                   Bankruptcy Judge